**WESTERN AIR LINES, INC., et al.,**
**Plaintiffs,**

v.

**ALLEGHENY AIRLINES, INC., a Delaware corporation, Defendant.**

**Civ. A. No. 4146.**

Court of Chancery of Delaware,
New Castle.

Sept. 27, 1973.

William O. LaMotte, III, Wilmington, for plaintiffs.

F. L. Peter Stone, of Connolly, Bove & Lodge, Wilmington, for defendant.

## OPINION ON PENDING MOTIONS

QUILLEN, Chancellor:

The plaintiff commercial air carriers are all signatories to a contract known as "the Airlines Mutual Aid Agreement" ("the Agreement"). This Agreement, as originally approved by the Civil Aeronautics Board ("CAB") in 1958, and amended from time to time thereafter, provides for mutual financial assistance to participants whose flight operations are shut down by certain classes of labor strikes. Prior to December 10, 1970, local service air carriers were not permitted to participate in the Agreement. However, a subsequent CAB approved amendment effective on that date allowed participation by such carriers.

Defendant Allegheny Airlines, Inc., ("Allegheny") is a Delaware corporation. It is the survivor of an April 12, 1972 merger between Allegheny and Mohawk Airlines, Inc. ("Mohawk") accomplished according to the provisions of the corporate law of the State of Delaware.

Since January 1, 1971, Mohawk had been a party to the Mutual Aid Agreement.[1] Allegheny, on the other hand, was never a signatory to the Agreement. On May 22, 1972, Allegheny notified the CAB that it

---

1. In fact, Mohawk received more than $6 million under the Agreement to help it weather a pilots' strike which ended in April of 1971.

considered Mohawk's membership in the Agreement to have been terminated at the time of the merger. Allegheny further denied liability for any post merger debts or obligations under the Agreement.[2] Throughout subsequent proceedings, Allegheny has continued to maintain that position. For example, in July 1972, when Northwest Airlines was struck, Allegheny refused to pay out the funds which Mohawk would have been expected to contribute under the Agreement.

On March 22, 1973, the plaintiffs brought an action in this Court seeking "injunctive and declaratory relief requiring that defendant Allegheny . . . abide by the terms of . . . [the Agreement] . . . by reason of its merger with Mohawk . . ."[3] The plaintiffs base their claim on successive contentions that applicable provisions of the Delaware Corporation Law, specific language of the Mohawk-Allegheny merger contract, and provisions of the Mutual Aid Agreement require that Mohawk's liabilities and obligations under the Agreement succeeded to Allegheny upon the merger.

## I.

While presenting appropriate substantive defenses to plaintiffs' claim, Allegheny also has raised certain procedural challenges to this Court's jurisdiction.

First, having filed a petition with the CAB seeking a determination of its liability prior to the filing of this suit, Allegheny, by motion on April 25, sought to stay proceedings in this Court pending a CAB decision. However, the CAB refused to take jurisdiction of the dispute[4] and Chancellor Duffy, on July 24, denied Allegheny's motion for a stay.

On June 18, Allegheny also filed a motion to dismiss. In support of this motion, Allegheny, by its briefs and in oral argument, offer two challenges to this Court's jurisdiction.[5] The Court will first consider these two challenges contained in Allegheny's motion to dismiss and then the other two pending motions.

## A.

Allegheny asserts that this Court lacks jurisdiction because all the issues raised herein are properly cognizable in a court of law. It vigorously contends that the only relief the plaintiffs really seek is the declaration of the existence of contractual obligations and damages for their breach. In other words, Allegheny asks this Court to find that, if it did indeed assume Mohawk's post-merger duties under the Mutual Aid Agreement, the plaintiffs have an adequate remedy at law for Allegheny's failure to fulfill those duties.

2. In order to protect itself, should it be found a member of the Agreement by reason of its merger with Mohawk, Allegheny gave notice (as provided by Section 3 of the Agreement) on December 26, 1972, of its intent to withdraw from the Agreement on December 31, 1973. The plaintiffs do not contest Allegheny's right to withdraw as of December 31, 1973, but seek to bind the defendant to the Agreement's terms until that date.

3. The plaintiffs pray that this Court enter a decree:
"1. Declaring the defendant Allegheny a party to the Airlines Mutual Aid Agreement by reason of its merger with Mohawk, subject to the withdrawal provisions of the Agreement;

2. Ordering Allegheny to perform all obligations required of it as a party to the Airlines Mutual Aid Agreement; and,
3. Granting plaintiffs such other, further and different relief as appears to the Court to be just and proper."

4. See CAB Order 73–5–40 (May 8, 1973). By Order 73–6–38, the CAB also denied Allegheny's petition for reconsideration.

5. In its Motion to Dismiss, Allegheny seeks dismissal on the following grounds:
"1. The Complaint does not state an equitable cause of action and therefore the Court lacks jurisdiction.
2. Primary jurisdiction of the issues herein resides in the Federal Civil Aeronautics Board to which this Court should defer."

Although it is ordinarily the case that:

" . . . a party aggrieved by a claimed breach of contract or injured as a result of a tort has a complete and adequate remedy at law in the form of an action for damages." [6]

the Court of Chancery is, historically, not without its jurisdiction in matters of contract. Professor Pomeroy wrote of this ancient aspect of equity in these terms:

" . . . notwithstanding the general maxim that chancery should only have jurisdiction of such matters as were not remediable by the common law, the Chancellor interfered, and extended his authority over facts and circumstances for which a legal remedy *was* provided, and gave a different and more efficient remedy wholly unknown to the common law. The equitable remedy of specific performance of contracts, although the law gave the remedy of damages, is an illustration of this class." (emphasis in original)

1 Pomeroy's Equity Jurisprudence (5th Ed.) § 52, p. 67; 4 *id.* § 1400, et seq.

The plaintiff air carriers argue that, in light of the particular facts of this case, specific performance of Allegheny's alleged obligations under the Mutual Aid Agreement, (not damages for breach), is their only adequate remedy. Allegheny contends that payment of money damages is sufficient remedy for any liability it might have. Thus, the question of equity jurisdiction turns on which proposition this Court believes appropriate in this case.

This Court does not lack practical guidelines from prior Delaware decisions to help it determine whether this case is proper for the exercise of its equity jurisdiction.

In Marshall v. Hill, 8 Terry 478, 481, 93 A.2d 524, 525 (Super.Ct.1952) Judge Herrmann summarized the prerequisites for a controversy under the Declaratory Judgment Statute, 10 Del.C. § 6501:

"(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination."

■ It is clear from the record that this action satisfies the above standards. However, that does not automatically guarantee this Court's jurisdiction. Unless the record indicates some special, traditional basis for equity jurisdiction, this Court does not have jurisdiction in a declaratory judgment action, City of Wilmington v. Delaware Coach Company, Del.Ch., 230 A. 2d 762 (1967). Nor is it controlling that the prayers of the complaint (see footnote 2, *supra*) might be couched in equitable terms.[7] Equity provides relief which is unavailable at law. Thus, this Court must determine whether or not adequate relief is available to these plaintiffs in the Superior Court, Delaware's court of law. Jefferson Chemical Co. v. Mobay Chemical Co., Del. Ch., 253 A.2d 512 (1969).

■ Since the existence of equitable jurisdiction must be ascertained from the viewpoint of the time when the plaintiffs filed their complaint, this Court must view the material factual allegations of their complaint as true. Diebold Computer

6. Hughes Tool Cmpany v. Fawcett Publications, Inc., Del.Ch., 297 A.2d 428, 432 (1972).

7. The role of the prayers has recently been viewed by Vice Chancellor Marvel in the *Hughes* case as follows:
" . . . prayers of a complaint do not rigidly control this Court's inquiry into

what it is that a plaintiff really seeks in filing a complaint and that this Court should, when required, go behind a facade of prayers in order to determine whether the relief sought is in fact equitable or legal." 297 A.2d at 431, 432.
See also Highlights for Children, Inc. v. Crown, 41 Del.Ch. 244, 193 A.2d 205 (1963).

Leas., Inc. v. Commercial Cr. Corp., Del. Super., 267 A.2d 586, 588 (1970). That is to say, for Allegheny to prevail on this threshold question of subject matter jurisdiction, it must show "as a matter of law that money damages . . . would be adequate or sufficient under the circumstances offered here." Fitzsimmons v. Western Airlines, Inc., Del.Ch., 290 A.2d 682, 684 (1972).

The record in this case justifies the conclusion that this action has been brought before the proper tribunal. When the plaintiffs filed this action in March, more than nine months remained in which Allegheny was allegedly bound to honor the Mutual Aid Agreement. The defendant had already refused to pay Mohawk's share of assistance during strikes against Northwest and two other airlines.[8] Moreover, other strikes were and are real possibilities. This threatened breach of contract aspect of the dispute, coupled with a legitimate need of plaintiffs to seek the protection of injunctive relief, would justify equitable jurisdiction.[9]

■■ The plaintiffs also claim that the threat of a mutiplicity of suits is a good reason for the Chancery Court to hear this case. Traditional equity practice doubtless includes the precept that equity may act in order to prevent a multiplicity of suits. Schneider v. Wilmington Trust Company, Del.Ch., 310 A.2d 897 (1973); Pomeroy's Equity Jurisprudence (5th Ed.) § 243 et seq.

However, mutiple actions are not a true threat here. All the plaintiffs are capable of being joined in a damages action in the Superior Court.

The plaintiffs do, nevertheless, offer a compelling basis for equity jurisdiction in this case. Given the nature of the contract they seek to enforce, damages for its breach are simply inadequate. The Airlines Mutual Aid Agreement is a complicated pact contemplating expeditious good faith performance by each of its members. Each must make its share of the assistance payments promptly and in the proper amount. [Section 1(A)].[10] Moreover, if such payments fail to total "the standard amount" (a percentage, determined according to formula, of the struck party's normal air transport operating expenses) further payments to the struck carrier may be necessitated. [Section 1(b)].[11] There is also a section [1(B)] providing for arbitration of disputes regarding the requirement to make or the right to receive payment.[12]

It is clear to the Court that damages are an inadequate remedy for failure to honor contractual obligations such as the Mutual Aid Agreement contemplates. One member's refusal to participate imposes a severe handicap on the others. Each is faced with an increased financial burden and the incredibly difficult task of determining what its share of the increase should be. Moreover, Allegheny's hand-

---

8. It is uncontested that this Court has the power to grant damages if it finds such refusals to constitute breaches of contractual obligations.

9. As Justice Herrmann wrote in *Diebold:*
   " . . . equity will take jurisdiction if the defendant has manifested an intent to act, even though it is not clear at the outset whether the action which the defendant is about to take is in violation of the contract." 267 A.2d at 590.

10. Section 1(A) provides, in part:
    " . . . each party will pay over to the party suffering the strike an amount equal to its increased revenues attributable to the strike during the term thereof . . . "

11. Section 2(B) provides, in part:
    "The additional payments required of each party . . . shall be in the proportion that such party's air transport operating revenue for the calendar year next prior to the year in which the strike occurs bears to the total of such revenue for *all* paying carriers . . . " (emphasis supplied).

12. There is a question under Delaware law over the availability of specific performance of an executory contract to arbitrate (see discussion *infra*). However, the answer to that question is not clearcut and it does not bar an appeal to equity as a threshold jurisdictional matter. Morgan v. Wells, 32 Del.C. 108, 80 A.2d 504 (1950).

tying refusal to participate could come in the midst of a strike, when time is of the essence and no member should, in fairness, be called upon to pay more than it has contracted to pay.

As in *Fitzsimmons, supra*, where a union was allowed to sue in equity to protect its contractual rights in the face of potential post-merger breach, the plaintiffs here are entitled to sue for specific performance of Allegheny's alleged contractual obligations.

■ Specific performance of a contract is, without doubt, a proper basis for equity jurisdiction. This is especially true, when a mandatory injunction compelling some positive action to change existing conditions may prove necessary. "[I]t is now well settled that . . . a court of equity can, and in the proper case will, award mandatory as well as prohibitive injunctive relief." 42 Am.Jur.2d Injunctions, § 16 (1969); Ex Parte Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110 (1897); Derwell Company v. Apic, Inc., Del.Ch., 278 A.2d 338 (1971); Pomeroy's Equity Jurisprudence (5th Ed.) § 1359a.

Vice Chancellor Bramhall once explained the standards for a mandatory injunction in these terms:

"Relief by mandatory injunction should only be awarded in a clear case, free from doubt, and when necessary to prevent irreparable injury. However, when the right is clear and the damage is irreparable, equity will not hesitate to act."

Richard Paul, Inc. v. Union Improvement Co., 32 Del.Ch. 322, 340, 86 A.2d 744, 748 (1952).

■ As shown above, damages at law would not be an adequate remedy for breach of the Airlines Mutual Aid Agreement. Specific performance would. It follows that the plaintiffs' case survives a motion to dismiss on the first challenge.

B.

Turning now to the second challenge, whether primary jurisdiction should reside with the CAB, it is hard to imagine a litigant coming into court with a greater practical disadvantage than Allegheny's position on this issue. The Civil Aeronautics Board, where Allegheny asserts primary jurisdiction lies, has refused to exercise such jurisdiction. That decision has been appealed by Allegheny.

Less significant as an adjudication on the merits, although worthy of noting, is the fact that the United States Court of Appeals for the District of Columbia Circuit by order dated August 27, 1973 refused to stay this suit pending Allegheny's petition to review the CAB decision on the CAB's jurisdiction.

But nonetheless this Court, under the present procedural state of the case, has the duty to take a fresh look at the contention of Allegheny that the CAB has primary jurisdiction of the Federal Aviation Act.

■ Allegheny argues that since, under Section 412 of the Act, 49 U.S.C., § 1382, an air carrier must file each contract affecting transportation for approval, it cannot be involuntarily coerced into the Airlines Aid Agreement by this lawsuit. This is nonsense. Although Allegheny did not file, Mohawk did. This lawsuit deals with the legal consequences, by statute and contract, of a very voluntary act, the Allegheny-Mohawk merger. The CAB has, as of now eliminated any overriding federal policy requiring a post merger approval under Section 412. The Board stated in the order denying reconsideration that: "in approval of the Allegheny-Mohawk Merger Agreement (Order 72–4–31/32) the Board contemplated that Allegheny would become liable for such obligations of Mohawk Airlines as might exist pursuant to the merger agreement or applicable corporate law." In the absence of a statute, regulation or decision, judicial or administrative, to the

contrary, that is, some authority requiring a fresh filing after merger under Federal aviation law, this Court concurs with the conclusion reached by the CAB. In short, if under the applicable state law, the successor corporation in a merger would be liable for a predecessor's obligations under the Mutual Aid Agreement, the filing requirements of Section 412 do not prohibit such liability. Mohawk did file and Allegheny is now Mohawk.

■ Allegheny also argues that since it has not received approval as party to the Agreement, under Section 414, 49 U.S.C. § 1384, it does not have anti-trust immunity bottomed on a CAB order, Again in the absence of an express federal policy to the contrary and no authority of merit has been cited, there would appear to be no reason why the CAB approval of Mohawk participation in the Agreement and the CAB agreement of the merger should not suffice to secure Allegheny anti-trust immunity if Allegheny under state law suceeds to Mohawk's obligations.

■ Finally, Allegheny contends that, under Section 408 of the Act, 49 U.S.C., § 1378, the Board in approving the merger did not have the benefit of the plaintiffs' claim that Allegheny, as successor to Mohawk, would be a party to the Agreement. The suggestion is that the plaintiffs' claim is a necessary incident to the merger approval by the CAB. But again the key question is whether any established federal policy is at stake. The CAB does not take jurisdiction over every question resulting from a CAB approved merger. Air Line Employees Assn. v. CAB, 134 U.S.App.D. C. 185, 413 F.2d 1092 (1969). There is no reason for it to do so here.

■ The CAB concluded that the present dispute contains no matters relating to the Board's consideration of the public interest in its approval of the merger under Section 408 or the Agreement under Section 412. The CAB was content to leave this dispute to the State court. This

Court concurs. This is not to say that a decision here cannot affect aviation policy or even other federal policy such as anti-trust policy. It is not to say that federal law is necessarily inapplicable. It is rather to say that the issues directly involved here are ones of corporate law and contract law and there is no established federal regulatory interest which operates to prevent these questions from being adjudicated in the State court. Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

The contention that this Court should dismiss this action because primary jurisdiction lies in the Federal Civil Aeronautics Board is rejected.

Accordingly, Allegheny's two pronged motion to dismiss must be denied.

## II.

The two other pending motions are related. The plaintiffs have moved pursuant to Rule 56(a) for summary judgment and the defendant, in addition to opposing the motion, has moved pursuant to Rule 56(f) for an order continuing for further discovery consideration of the plaintiffs' motion. It is the defendant's position that an important issue is whether it was the intent of parties to the Agreement to bind successors and that further discovery is needed to fairly evaluate such intent. The Court therefore must examine the record on the plaintiffs' motion for summary judgment to determine whether the motion should be granted or denied or whether consideration of the motion should be continued.

In support of the motion, the plaintiffs rely on the Delaware merger statute, the terms of the merger itself, and the language and purposes of the Agreement. At oral argument, the plaintiffs suggested that if any one of these created obligations in Allegheny they were entitled to pretrial judgment. This contention appears erroneous to the Court. For example, even if the Delaware statute obligates the successor corporation in a merger situation to as-

sume the obligations of a predecessor, contractual obligations would not pass if the parties by their objective contractual language contemplated that such obligations would not pass. So the situation must be viewed as a whole and not piecemeal. Fitzsimmons v. Western Airlines, Inc., Del. Ch., 290 A.2d 682 (1972).

There is little to argue about in regard to the statute and the merger agreement.

The statute, 8 Del.C., § 259(a) states quite simply that "all debts, liabilities, and duties of the respective constituent corporations shall henceforth attach to [the] surviving corporation and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." The statute means what it says and it is in accord with the general law even without a statute or an agreement. Indeed, it supplies the rationale for the general rule that creditors will not be allowed to prevent a merger. Fitzsimmons v. Western Airlines, *supra*; 19 Am.Jur.2d, Corporations, § 1554; Cole v. National Cash Credit Association, 18 Del.Ch. 47, 156 A. 183 (Ch.1931).

The Allegheny-Mohawk merger agreement echoes the statute in the following terms:

"all rights of creditors and all liens upon any property of either of the Constituent Corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective Constituent Corporations shall upon the effective date of the merger attach to the Surviving Corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." Merger Agreement, Art. IX, Para. 9.01.

The language is clear and clearly runs in favor of third party beneficiary creditors of Mohawk. Restatement, Contracts, § 136(1)(a); Wilmington Housing Authority v. Fidelity & Deposit Co., 4 Terry 381, 47 A.2d 524 (Sup.Ct.1946); Royal Indemnity Co. v. Alexander Industries, Inc., Del. Supr., 211 A.2d 919 (Sup.Ct.1957).

The only real dispute is Allegheny's claim that the parties in the Agreement did not contemplate that its obligations would survive the merger of a party into non-party.

In support of its argument, Allegheny notes that neither the Agreement nor Mohawk endorsement has a "successors and assigns" clause, that it is against public policy to interpret the contract to bind "successors and assigns", and that intent is generally a factual question for trial.

■■ It is difficult to understand Allegheny's public policy argument in the corporate merger context. The one case cited by Allegheny, NLRB v. Burns Security Services, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), is completely irrelevant since it deals with the non-continuation of collective bargaining obligations upon the substitution of one plant protection company for another on the expiration of the other's contract. The overriding public policy in this case is the clear policy governing the continuation of obligations upon the merger of corporations which has already been noted in this opinion.

■■ Nor is the absence of a "successors and assigns" clause significant in the context of a corporate merger and this Agreement. The Agreement specifically details a method of withdrawal in language that was obviously specifically adopted to serve the purposes of the Agreement.[13] In

13. The Agreement reads in part as follows: "3. This Agreement shall continue in effect until December 31, 1973, and thereafter from year to year, but any party may withdraw effective as of December 31, 1972, or December 31 of any year thereafter by giving at least one year's written notice to the other parties and the CAB. Upon such notice of withdrawal by any party, any other party may also withdraw effective as of December 31 of the same year by giving at least eleven months' written notice to the other parties and the CAB."

view of that express language, it is not reasonable to argue by inference that the parties intended that a withdrawal from the Agreement could be accomplished by merger. Laird v. Employers Liability Assur. Corp., 2 Terry 216, 18 A.2d 861, (SuperCt.1941); 17A C.J.S. Contracts § 294b (1963). It is Allegheny, not the plaintiffs, which seeks to insert a term in the contract which is not there.

Moreover, it is necessary again to consider the public policy, clearly expressed in law, which holds that the obligations of the extinguished corporation in a merger survive as obligations of the surviving corporation. If the agreement does not specifically state that it is not applicable to successors and assigns, the policy of the law is so clear that survival should be taken as the normal course of events. Contracts must be written and construed in light of generally accepted legal principles. 17 Am.Jur.2d Contracts, §§ 241, 243, 257 (1964).

In this Court's judgment, the contract and contractual intent in this case are clear as a matter of law. There is no uncertainty in the contractual language which reasonably support Allegheny's contention. The Agreement speaks for itself and leaves nothing to further discovery. Mundy v. Holden, 42 Del.Ch. 84, 204 A.2d 83 (Sup. Ct.1964). The motion for a continuance in the consideration of the summary judgment motion is therefore denied.

Allegheny makes several miscellaneous points in addition to the arguments noted above. First, Allegheny claims that, in the course of a CAB hearing, Allegheny specifically informed the Board that "Mohawk Airlines' membership terminated at the time of its merger into Allegheny Airlines on April 12, 1972." Second, Allegheny argues that a witness for Eastern testified in a CAB hearing that Allegheny would assume "the old obligations of Mohawk," suggesting no continuing obligation after merger. Third, Allegheny notes that none of the plaintiffs who participated in the CAB merger hearing indicated that Allegheny would be liable for post-merger strikes under the Agreement.

The short answer to all these assertions is that they do not change the clear legal result. In the first place, the implication to be drawn from any or all of them is not clear as the defendant suggests. Surely, any or all of them do not amount to a waiver, a knowing relinquishment of a known right. And the existence of these extrinsic facts, each made in a context where the present issue was not at a head, does not change the clear intention manifested in the Agreement. Keene Corp. v. Hoofe, Del.Ch., 267 A.2d 618 (1970), aff'd, Del.Supr., 276 A.2d 269; 32A C.J.S. Evidence § 851 et seq. (1964).

Nor can Allegheny gain any help by its claim that the plaintiffs did not seek to arbitrate their claim. The plaintiffs do not have to seek to arbitrate when Allegheny has informed them that it does not consider itself bound by the Agreement. The plaintiffs are not required to do a useless act. Munchak Corporation v. Cunningham, 457 F.2d 721 (4th Cir., 1972).

Finally, Allegheny argues that since the merger the Agreement is impossible for Allegheny to perform due to the integration of personnel and operations of Mohawk and Allegheny and that no one has told Allegheny how liability can be assessed under the formula in the Agreement in light of such integration. It is not necessary for the Court at this stage to deal with the impossibility argument. Indeed, there is no factual basis, only conclusory assertions, in the present record on this issue. The argument is premature.

The Court concludes that an order should be entered declaring that, by virtue of its merger with Mohawk, Allegheny is a party to the Airlines Mutual Aid Agreement and requiring Allegheny to operate in a manner consistent with the provisions of that Agreement, including the sharing of relevant information, and, if there is no

dispute, the prompt calculation and tendering of payments due to struck members. To that extent, the plaintiffs' motion for summary judgment is granted.

By passing reference at oral argument, Allegheny raised the possibility that arbitration under Section 1(E) of the Agreement may eventually prove necessary if the parties are unable to agree as to how much Allegheny owes now or might owe as the result of a future strike. In particular, Allegheny somewhat casually questioned the power of this Court to mandate arbitration under Delaware law. This question was not briefed and the Court need not decide the question at this point. The order to be entered should not go so far at this time as to direct arbitration.

At this time the Court will merely note that Delaware law is somewhat unclear as to the propriety of ordering specific enforcement of an arbitration agreement. Recent conflicting Superior Court decisions have yet to be reconciled. Compare Nelson v. Allstate Insurance Company, Del.Super., 298 A.2d 337 (1972) with Pullman, Incorporated v. Phoenix Steel Corporation, Del.Super., 304 A.2d 334 (1973). The effect of the public policy enunciated in the Uniform Arbitration Act, 10 Del.C., §§ 5701–5728, on arbitration agreements made prior to June 30, 1972 is possibly open to further exploration. And the fact that the CAB sanctioned the arbitration provision of the Mutual Aid Agreement raises a potential question of the applicability and involvement of federal law which need not be answered at this point.

The plaintiffs should present an order, on notice, within ten days.