COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PAUL A. FIORAVANTI, JR.
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted:  February 1, 2023
Date Decided:  April 6, 2023

Richard I.G. Jones, Jr., Esquire
David B. Anthony, Esquire
Berger Harris LLP
1105 N. Market Street, Suite 1100
Wilmington, DE 19801

Catherine Damavandi, Esquire
Nurick Law Group, LLC
501 Silverside Road, Suite 95
Wilmington, DE 19801

Theodore A. Kittila, Esquire
Halloran Farkas + Kittila LLP
5801 Kennett Pike, Suite C/D
Wilmington, DE 19807

Thomas Hanson, Esquire
William J. Burton, Esquire
Barnes & Thornburg LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

John A. Elzufon, Esquire
Elzufon Austin & Mondell, P.A.
300 Delaware Avenue, 17th Floor
Wilmington, DE 19801

Brian Skinner, pro se
111 Veronica Lane
Bear, DE 19701

RE:   *Stone & Paper Investors, LLC v. Richard Blanch et al.*,
        C.A. No. 2018-0394-PAF

Dear Counsel:

This letter addresses the final issue in this protracted dispute that has continued on multiple fronts following the issuance of the court's post-trial memorandum opinion on July 30, 2021 (the "Memorandum Opinion").  Stone & Paper Investors, LLC ("Stone & Paper" or "Plaintiff") requests an award of its

attorneys' fees and expenses to be paid by Richard Blanch, Vivianna Blanch, and

Red Bridge & Stone ("Red Bridge") (collectively the "Blanch Defendants") and

Clovis Holdings LLC ("Clovis" or the "Company").  The Blanch Defendants

likewise are seeking an award of their attorneys' fees from Stone & Paper.[1]

## I.    BACKGROUND

The gravamen of the parties' dispute as to fee shifting centers on pretrial

discovery, motion practice, and issues that are ancillary to those that the court

decided in its Memorandum Opinion.  Some of the post-opinion conduct, however,

is consistent with the pretrial conduct that the parties cite as grounds for fee shifting.[2]

---

[1] For ease of reference, the court will use the first and last names of Richard and Vivianna Blanch and will identify their trial or deposition testimony by using their first initial followed by their last name.  No disrespect or familiarity is intended.  Trial exhibits are cited as "JX" followed by the relevant page number.  Citations to the docket in this action are in the form of "Dkt. [#]."  Citations to the trial transcript in this action are in the form of "Tr. [#]."

[2] The background of the dispute can be found in the three earlier decisions of the court in this matter. *Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005 (Del. Ch. May 31, 2019); *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694 (Del. Ch. June 29, 2020); and *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373 (Del. Ch. July 30, 2021). Following the Memorandum Opinion, the court also issued an order denying a motion for reargument. *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 4264047, at *1 (Del. Ch. Sep. 17, 2021) (ORDER).  On December 5, 2022, the court granted motions to dismiss the remaining claims in this case, which had severed from the trial, *see* Dkts. 454, 455, 465, and a motion for reargument of that decision. *Stone & Paper Invs., LLC v. Blanch*, 2023 WL 1815793 (Del. Ch. Feb. 1, 2023) (ORDER).  Those same claims were also asserted in a separate action in this court and were voluntarily dismissed with prejudice. *Clovis Hldgs. LLC v. Stone & Paper Invs*., LLC, Del. Ch. C.A. No. 2021-0273-PAF Dkt. 11 (Mar. 9,

On May 31, 2018, Stone & Paper filed this action on behalf of itself and derivatively on behalf of nominal defendant Clovis against the Blanch Defendants, Brian Skinner ("Skinner"), and Skinner Capital, LLC ("Skinner Capital"). On July 24, 2019, Richard Blanch, Red Bridge and Clovis filed counterclaims against Stone & Paper and third-party claims against numerous defendants, including the two principals of Stone & Paper and their respective spouses.[3] Richard Blanch, one of Clovis's two managers, verified the counterclaims and third-party claims filed on the Company's behalf.[4] Counsel for the Blanch Defendants also represented the Company throughout the litigation.

On June 29, 2020, the court dismissed most of the counterclaims and all the third-party claims, leaving only the counterclaims for breach of Clovis's LLC Agreement (the "LLC Agreement") and unjust enrichment against Stone & Paper.[5] On September 22, 2020, two months before trial, the Blanch Defendants and Clovis filed amended counterclaims, which included new claims against Stone & Paper and

---

2022). The court later denied a motion for relief from judgment in that action. *Id*. at Dkt. 19.

[3] Dkt. 64.

[4] *Id*. Richard Blanch also verified the Company's amended pleadings and discovery responses. *See* Dkt. 19; Dkt. 108 Exs. F & H; Dkt. 221.

[5] Dkt. 158.

third-parties.[6]  The defendants to these new claims moved to dismiss or sever the claims from the upcoming trial.  On November 18, 2020, the court entered an order dismissing two of the counterclaims and severing four of the new claims from the upcoming trial.[7]  The court conducted a four-day trial from December 14 through December 17, 2020.

As explained in the Memorandum Opinion, Richard Blanch and Skinner breached the LLC Agreement and their fiduciary duties, and engaged in fraudulent concealment.  The court found Vivianna Blanch, Skinner Capital, and Red Bridge liable for aiding and abetting and civil conspiracy.  In addition, the court found Stone & Paper liable for breach of contract.[8]  The court requested supplemental briefing on three unresolved issues:  fee shifting, possible dissolution of Clovis, and to whom certain damages should be paid.  The court resolved the latter two issues on January 6, 2022.[9]

---

[6] Dkt. 221.

[7] Dkt. 293.

[8] The court awarded Stone & Paper $988,510 in damages against the Blanch Defendants and $1,082,500 against Skinner and Skinner Capital, for which Defendants are jointly and severally liable.  Clovis was awarded damages in the amount of $510,124.35 from Skinner. Clovis was awarded damages in the amount of $21,000 from Stone & Paper.  *Stone & Paper*, 2021 WL 3240373, at *38.

[9] Dkt. 417.  The court declined to dissolve the Company.  The court ordered that Mr. Skinner's liability to Clovis in the amount $510,124.35 be paid directly to Stone & Paper,

As to fee shifting, Plaintiff requested an award of fees due to "the Blanch Defendants' bad faith conduct throughout this litigation and vexatious filings of frivolous counterclaims and third-party claims."[10] By contrast, the Blanch Defendants asserted that Plaintiff should be responsible for the Blanch Defendants' legal fees, describing Plaintiff's claims as a "frivolous lawsuit" and arguing that Plaintiff engaged in bad-faith conduct from the date of Clovis's formation.[11] The court deferred consideration of the competing fee applications at that time and, instead, requested that the parties "submit supplemental briefing on the fee requests in light of the conclusions reached in th[e] Memorandum [O]pinion on liability and damages."[12] The parties submitted supplemental briefing and continued to litigate the remaining claims, which were ultimately dismissed on December 5, 2022.[13] The Blanch Defendants on behalf of Clovis filed a motion for reargument, which the

---

$21,000 of which was to be offset by the amount of Stone & Paper's liability to the Company. *Id.* Tr. at 18.

[10] Dkt. 297 (Pl.'s Pretrial Br.) at 59; PTO § V.A.3. Plaintiff reiterated its argument that it was entitled to fee shifting in its post-trial papers as well. *See* Dkt. 355 at 54–59.

[11] Dkt. 366 at 40–41.

[12] *Stone & Paper*, 2021 WL 3240373, at *37.

[13] Dkts. 454, 455.

court denied on February 1, 2023.[14]  The court considers the fee applications fully submitted as of that date.

## II.  ANALYSIS

### A.  Fee Shifting

Under the American Rule, each party is responsible for its own attorneys' fees regardless of the outcome of the litigation.  *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).  This default rule is not invariable, and there are several recognized exceptions.  One exception allows for fee shifting if a party either files a claim in bad faith or engages in bad-faith conduct over the course of litigation.  *See Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010).  "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."  *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998) (citations omitted).  Changing position on an issue can also constitute bad faith.  *Beck v. Atl. Coast PLC*, 868 A.2d 840, 851 (Del. Ch. 2005).

---

[14] Dkt. 469.

The purpose of the bad faith exception is to "deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process." *Dover Hist. Soc., Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084, 1093 (Del. 2006) (internal quotations omitted). The party seeking to invoke this exception must demonstrate by "clear evidence" that the accused party "acted in subjective bad faith." *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) (internal quotations omitted). In cases where the court has held that the accused party breached their duty of loyalty, "potentially harsher rules come into play and the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *William Penn*, 13 A.3d at 758 (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *3 (Del. Ch. May 11, 2001)) (internal quotations omitted).

### B. Stone & Paper's Fee Application

Stone & Paper seeks recovery of its attorneys' fees and expenses from the Blanch Defendants and Clovis, but not from their counsel.[15] Stone & Paper also does not seek to recover fees from Skinner or Skinner Capital.

---

[15] Dkt. 400 (Pl.'s Post-Trial Supp. Opening Br.) at 32 (confirming that Plaintiff is "not seeking recovery [of its fees] from counsel or her firm").

### 1. The Blanch Defendants Conducted Discovery in Bad Faith

Throughout the course of discovery, the Blanch Defendants engaged in numerous bad-faith tactics that prolonged the discovery process, making it unduly tedious for Plaintiff. The Blanch Defendants repeatedly flouted the court's deadlines without explanation or requests for extensions and improperly withheld documents. A few examples follow.

After the court denied the Blanch Defendants' motion to dismiss the original complaint, they were required to file answers by June 14, 2019. They did not do so, prompting Plaintiff to file a motion for entry of a default judgment.[16] The Blanch Defendants belatedly filed answers on July 19 and 24.[17]

Also in July 2019, the Blanch Defendants filed untimely responses to Plaintiff's first requests for admission ("Plaintiff's First Requests for Admission") and then did not respond to Plaintiff's interrogatories ("Plaintiff's Interrogatories") and requests for production ("Requests for Production") until after Plaintiff filed a motion to compel.[18] On August 12, 2019, after Plaintiff identified deficiencies in

---

[16] Dkt. 55.

[17] Dkts. 63–64.

[18] *See* Dkts. 57, 61, 62.

the responses, the Blanch Defendants agreed to revisit those responses.[19]  Yet two more months passed with no amended responses, which the Blanch Defendants later attributed to an "oversight."[20]  The Blanch Defendants eventually served *some* of those amended responses on October 31, 2019.[21]

The Blanch Defendants' disorganized and dilatory pattern of effectuating discovery persisted.  The Blanch Defendants owed Plaintiff discovery responses on behalf of Clovis by November 25, 2019.  The Blanch Defendants filed a notice of service on November 25, certifying that the responses had been served by first-class mail on that date.[22]  This was unusual, because the Blanch Defendants and the Company had served other case filings, including discovery responses, electronically.[23]  After several days passed, Plaintiff's counsel sent emails to the Blanch Defendants' counsel, noting that the responses had not been received and requesting tracking data about the mailing.[24]  Instead of responding to the emails, on December 6, 2019, the Blanch Defendants and Clovis hand delivered the responses,

---

[19] *See* Dkt. 108, Ex. B.

[20] Dkt. 108, Ex. C.

[21] *See* JXs 454, 455.

[22] *See* Dkts. 103–104.

[23] *See*, *e.g.*, Dkts. 59–62, 84.

[24] Dkt. 108, Ex. F.

along with Richard Blanch's undated verification.[25] There is no evidence in the record that the responses, purportedly mailed on November 25, were ever delivered.[26] The reasonable inference to be drawn is that the Blanche Defendants and Clovis never mailed the responses, particularly given the breadth of the Blanch Defendants' discovery misconduct.

On January 21, 2020, counsel for the parties met and conferred regarding the Blanch Defendants' continued refusal to produce certain documents in response to Plaintiff's First Requests for Production. The Blanch Defendants promised to provide Plaintiff with revised responses by January 23 but did not serve them until February 10.[27]

The Blanch Defendants' approach to document production was reprehensible. For starters, Richard Blanch admitted that he did not provide his discovery vendor access to his computer until 2020—two years after the commencement of the litigation.[28] Vivianna Blanch admitted to never searching her files for responsive

---

[25] *Id.*

[26] Plaintiff specifically pointed out this discrepancy in its February 17, 2020 motion to compel, but the Blanch Defendants and Clovis did not respond. *See* Dkt. 108 ¶ 6.

[27] *See* Dkt. 108, Ex. H.

[28] Tr. 869:9–11 (R. Blanch). For reference, the Plaintiff served its first request for production of documents in May 2019, and the Blanch Defendants served responses in July 2019. See Dkts. 52, 61.

materials to Plaintiff's discovery requests.[29]  When the Blanch Defendants finally produced documents on behalf of Clovis, the production consisted of one, non-searchable, 2,246-page PDF that lacked any metadata.  Plaintiff responded with a request that the Blanch Defendants and the Company produce the documents in a searchable format.[30]  Plaintiff pointed out that the document request included an instruction that documents be produced in a searchable format and reminded the Blanch Defendants' counsel that the Blanch Defendants and the Company did not object to that instruction.  The Blanch Defendants and the Company responded with a terse email:  "We decline to produce the metadata.  Your request appears to be an attempt to make this litigation more expensive for the Blanch Defendants."[31]  To surmount this belated and unjustified objection, Plaintiff was forced to file another motion to compel, which this court largely granted.[32]  The Blanch Defendants also attempted to prevent Plaintiff from obtaining third-party discovery by opposing nine motions for commission, all of which the court granted.[33]

---

[29] Tr. 905:8–10 (V. Blanch).

[30] Dkt. 108, Ex. H.

[31] *Id.*; *see* Dkt. 52.

[32] *See* Dkt. 127.

[33] *See* Dkts. 105, 128–36.  In ruling on the several discovery motions, the undersigned, being new to the court, declined to shift fees "at this time."  Dkt. 143 at 127.  The persistent

Once the Blanch Defendants had produced documents, it became apparent that the Blanch Defendants had improperly withheld from Plaintiff many responsive emails—some of which were detrimental to the Blanch Defendants' defense.[34] Plaintiff was able to discover these omissions by reviewing documents produced by other parties or non-parties. Plaintiff's requests for an explanation for this failure to produce these documents went unanswered.[35] By way of example, Plaintiff's counsel discovered during Vivianna Blanch's deposition that the Blanch Defendants did not produce a particularly damaging email that put her in the middle of the conspiracy Plaintiff alleged in this case and showed her aiding and abetting Richard Blanch's breach of fiduciary duty.[36] When this issue was first presented, along with other discrepancies in the document production, the court requested further briefing from the Blanch Defendants to provide the court with a better understanding of the Blanch Defendants' document review process.[37] After six weeks passed without

---

pattern of discovery abuse and flouting of rules and deadlines which continued after that motion persuade me that fee shifting is warranted.

[34] *See, e.g.*, JXs 17, 53, 76, 121, 130–32, 144, 161, 266, 367, 417, 427–28, 434.

[35] *See* JX 500.

[36] JX 76; The email showed that Richard Blanch instructed Vivianna Blanch to open a bank account on behalf of Red Bridge that would be receiving monthly consulting fees from Clovis in exchange for consulting services that neither Red Bridge nor Vivianna Blanch ever performed. *See Stone & Paper*, 2021 WL 3240373, at *7–8, 30.

[37] Dkt. 286 at 32–35.

further explanation from the Blanch Defendants, the court included the following in the pretrial order entered on December 9, 2020:

> [T]he Blanch Defendants are to provide a detailed, written explanation, supported by affidavits or declarations, concerning: (1) the belated production of the document that came to light during Vivianna Blanch's deposition; (2) the ediscovery review process that counsel for the Blanch Defendants referenced at the October 22, 2020 teleconference; (3) how document custodians were identified, what repositories were searched, how documents were harvested, reviewed, and produced, who was involved in the document collection, review, and production process, and who made the determinations as to responsiveness. The Blanch Defendants' submission shall describe counsel's involvement in the document production process. The foregoing submission it to be filed by the start of trial on Monday, December 14, 2020 at 9:15 a.m.[38]

On December 14, 2020, counsel for the Blanch Defendants and Clovis filed a declaration averring that the Vivianna Blanch email in question had initially been withheld due to spousal privilege, but mistakenly had not been produced after the Blanches later determined not to assert spousal privilege.[39] Yet the declaration never addressed why the document had not been previously identified on a privilege log. Furthermore, the declaration provided no detailed explanation of the issues identified in the court's December 9 order.

---

[38] Dkt. 313.

[39] Dkt. 335.

As the trial approached, the Blanch Defendants sought to add a purchase order to the trial exhibits, but refused to produce this document to Plaintiff absent a confidentiality agreement.[40]   Plaintiff questioned the need for a confidentiality agreement given Plaintiff's role a member and the sole investor in Clovis and that no confidentiality order had ever been entered in the case.[41]  The Blanch Defendants nevertheless persisted, arguing without any good-faith basis that John Diamond, Stone & Paper's principal, had disclosed confidential testimony.[42]   The Blanch Defendants produced this purchase order only after Plaintiff enlisted help from the court.[43]

### 2.    The Blanch Defendants Unnecessarily Complicated this Litigation

The Blanch Defendants regularly changed their arguments and theories for their defense.  It is, of course, natural for theories to shift as newfound facts are revealed through the course of discovery.  Here, though, the factual bases for the Blanch Defendants' altered arguments were known by them  from the very beginning.

---

[40] Dkt. 309, Ex. D.

[41] *Id.*

[42] *Id.*

[43] *See* Dkts. 309, 345.

For example, in their third-party complaint and counterclaims, filed on July 24, 2019, the Blanch Defendants alleged that Diamond, Albert Carter (Diamond's business partner and Stone & Paper's other founder), and their spouses were responsible for taking approximately $2 million from Clovis "without providing any consideration or benefit . . . in return."[44] At oral argument on the motion to dismiss those counterclaims, counsel for the Blanch Defendants represented to the court that Diamond was "the one who's transferring funds out of the company."[45] By the time of the trial, however, all Defendants, including the Blanch Defendants, admitted to receiving over $2.4 million from Clovis.[46] The Company was only capitalized with $3.5 million and never generated significant revenue.[47] It was thus impossible for the Blanch Defendants' allegations to be true, knowing that the Defendants had already taken over $2.4 million out of the Company.[48]

---

[44] Dkt. 64 ¶¶ 169, 206.

[45] Dkt. 143 at 42:20–21.

[46] Dkt. 313 ¶¶ 12–15; Dkt. 366 at 26–28.

[47] *Stone & Paper*, 2021 WL 3240373, at *7, 35.

[48] Richard Blanch's testimony on this point was evasive and lacked credibility. *See* Tr. 832:11–839:8. He ultimately conceded that when he made the allegation in the counterclaims "we were still trying to get information together" on the amounts in question, even though he was a manager of the Company. *Id*. 834:5–7.

The Blanch Defendants also denied some of Plaintiff's pre-trial requests for admissions that were easily verifiable, forcing the Blanch Defendants to reverse course at trial.[49] Likewise, before trial, the Blanch Defendants asserted that Clovis made payments in the form of a salary or management fees to Red Bridge, while arguing in their post-trial briefing that those payments were actually loans.[50] The Blanch Defendants also reversed their positions on whether loans made by the

---

[49] *Compare, e.g.*, JX 463 ("**Request for Admission No. 20:** Admit that The Roth Law Firm received $115,000 from Clovis. **Amended Response:** Denied.") (bolding in original), *with* Tr. 733:5–9 (R. Blanch) ("Q. Clovis also made payments totaling $115,000 to The Roth Law Firm on your personal behalf. Am I right? A. Correct."); compare JX 457 at 33 (refusing to admit the payment of $75,000 from Clovis to Spangler Scientific), *with* Tr. 733:20–24 (R. Blanch) ("Q. $75,000 went from Clovis directly to Spangler Scientific . . . . Right? A. Correct.").

[50] *Compare* JX 473 at 14 ("Salary/management fees were paid by Clovis Holdings, LLC to Red Bridge."), *with* Dkt. 366 at 11–12 ("On November 20, 2016, John Diamond approved the reclassification of the Managers' salaries from guaranteed payments to loans."), 28 ("Richard Blanch was receiving a salary, that would later be reclassified as a loan").

Company to Red Bridge had been repaid,[51] as well as who managed[52] and owned[53]

Red Bridge.  The Blanch Defendants also routinely switched positions regarding the

management and operations of Clovis.[54]

---

[51] *Compare* JX 445 at 6 (admitting that no repayment of loans from Clovis to Red Bridge had been made), *with* Tr. 768:3–6 (R. Blanch) (taking the position that "all of the loans to Red Bridge [made by Clovis] were paid off").

[52] *Compare* JX 455 at 4 (Interrogatory response stating that "[a]t all times, Richard Blanch was the sole manager of Red Bridge & Stone, and made all decisions for the company"), *with* Tr. 785:8–786:1 (R. Blanch) (admitting that the previous interrogatory response was untruthful because Vivianna Blanch in fact engaged in the business operations on behalf of Red Bridge and was the sole manager of Red Bridge for a time as well).

[53] *Compare* Dkt. 19 at 6 (Blanch Defendants' brief filed on July 11 2018 stating that "Vivianna Blanch was the owner of Red Bridge & Stone, LLC") *and* Tr. 915:8–11 (V. Blanch) ("I was the sole owner [of Red Bridge]") *and* Tr. 782:16–21 (R. Blanch) ("Q. And when [Red Bridge] was formed, your wife was identified as the sole member of the company?  A. Yes."), *with* JX 473 at 18 (Blanch Defendants' response to request for admission served on August 17, 2020 stating that "Richard Blanch and Vivianna Blanch were the members of Red Bridge when it was formed on January 10, 2014").

[54] *Compare* JX 457 at 58 (admitting that "Clovis never owned any subsidiaries"), *with* JX 473 at 17 (admitting that "Stone & Paper Operations, LLC is a wholly owned subsidiary of Clovis Holdings, LLC").  *Compare* R. Blanch Oct. 8, 2020 Dep. Tr. 31:11–24 ("Q. When did you first learn that Brian Skinner was putting charges on the Diamond Carter Trading American Express card and paying them with Clovis Holdings funds?  A. It would have been—I don't know the exact date but it would have been at some point in 2015."), *with* Dkt. 354 at 5 ("Richard Blanch did not learn about [the payments to the American Express account] until March 2018").  *Compare* R. Blanch Oct. 5, 2020 Dep. Tr. 123:21–124:13 ("Q. So in those board meetings what was decided, which of your authority did you delegate to John Diamond?  A. I specifically had delegated the financial aspect of the company to Brian [Skinner] and John [Diamond] that they could—they would manage the payments of the business; the bank account of the business, the accounting for the business . . . .  Q. So just before you move on, your testimony under oath is that John Diamond was tasked . . . with all things financial for the business in conjunction with Brian Skinner?  A. Absolutely, yes."), *with* Tr. 690:12–24 (R. Blanch) ("Q. And at any time did you delegate

The Blanch Defendants' pre- and post-trial conduct also contributed to the unnecessary delay and complication of this case. For example, shortly before trial, the Blanch Defendants and Clovis asserted amended counterclaims and third-party claims.[55] The amended counterclaims and third-party claims asserted several new claims against Stone & Paper and third-parties who either (1) had been previously succeeded in having all claims against them dismissed and were no longer involved in the case, or (2) had not been served with the prior third-party complaint and, therefore, had not entered appearances in the case.[56]

The court dismissed certain of the newly asserted claims and severed others from the upcoming trial.[57] The court determined that it would be manifestly unjust to require third-parties to participate in trial only a few months after having first been served with the claims against them, particularly when the Blanch Defendants and

---

your rights and powers to manage and control the business and affairs of Clovis Holdings to anyone else? A. I don't believe that I delegated my rights or my powers.").

[55] Dkt. 221.

[56] The court observed that it appeared that the Blanch Defendants and Clovis had not served the amended counterclaims on certain of the defendants. Dkt. 310 at 53:12–20. That observation was based on a review of the docket, which did not reflect service having been made on the newly named defendants. It was not until a week after the court dismissed all of the remaining claims in this case on December 5, 2022 that counsel for the Blanch Defendants and Clovis filed returns of service on the docket. *See* Dkts. 458, 459.

[57] Dkts. 270, 293.

Clovis had been aware of the facts giving rise to those claims for a year or even longer. Undeterred, on March 31, 2021—after post-trial briefing, but before post-trial argument—Richard Blanch caused Clovis to file a separate action in this court asserting the identical claims that had previously been severed from the trial.[58] Thus, Stone & Paper and the other defendants in the new action—who were also counterclaim or third-party defendants in this action—were confronted with having to litigate identical claims in two separate actions. The remaining claims were ultimately dismissed in both actions; nevertheless, they caused an unnecessary and inexplicable drain of time and resources on the parties and the court.

The conduct described above is not an exhaustive list of the Blanch Defendants' bad-faith conduct in this case.[59] But it exemplifies an egregious pattern

---

[58] *Clovis Hldgs. LLC v. Stone & Paper Invs., LLC*, Del. Ch. C.A. No. 2021-0273-PAF.

[59] For example, the Blanch Defendants unjustifiably violated a court order that required the filing of pretrial briefs on November 20, 2020, prompting the court to issue an order to show cause. *See* Dkt. 298. Rather than file their brief, the Blanch Defendants filed a letter with an unsatisfactory excuse for their violation of the scheduling order. Dkt. 299. The court made clear at that time that it was "reserv[ing] decision on an appropriate sanction." Dkt. 300 at 2. In addition, several of the belatedly filed amended counterclaims and third-party claims sought punitive damages, even though they are not available. *See* Dkt. 221 ¶¶ 307, 351, 378; *Beals v. Wash. Int'l, Inc.*, 386 A.2d 1156, 1159 (Del. Ch. 1978) (explaining that the Court of Chancery lacks jurisdiction to impose punitive damages); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 886 (Del. Ch. 2022) ("Absent a statutory grant of authorization, the Delaware Court of Chancery does not have jurisdiction to assess punitive damages."). The Blanch Defendants also filed a meritless motion to strike Stone & Paper's stipulation and proposed order for substitution of counsel, Dkt. 80, on the grounds that a

of obfuscation, deceit, and misconduct that requires judicial action. Fee shifting is warranted to compensate Stone & Paper for the excessive additional expense incurred due to the Blanch Defendants' conduct, to deter similar abusive conduct in the future, and to protect the integrity of the judicial process. *Dover Hist. Soc.,* 902 A.2d at 1093 (Del. 2006).

### C. The Blanch Defendants' Fee Application

Eschewing realism and appealing to magical thinking, the Blanch Defendants continue to press their application for an award of their fees against Stone & Paper under the bad-faith exception.[60] Ironic as this may seem, it is emblematic of the Blanch Defendants' approach to this case, at least for the three years in which this judicial officer has presided over the proceedings. The Blanch Defendants' fee application is wholly without merit. The Blanch Defendants lost on nearly every

---

formal motion was required, Dkt. 82, even though this court has held that a stipulated order satisfies the rule. *Phoenix Equity Gp. LLC v. GPG Justison P2 LLC*, 2009 WL 5200087, at *1 (Del. Ch. Dec. 7, 2009) ("In lieu of a motion, parties may file a stipulation and order providing for the withdrawal of counsel and the entry of an appearance by successor counsel."). The Blanch Defendants' motion to strike did not cite this controlling authority. The court granted the stipulation without hearing argument or requesting a reply. *See* Dkt. 95.

[60] *Cf.* Tennessee Williams, A Streetcar Named Desire 117 (Penguin Books 1974) (1947) ("BLANCHE: I don't want realism. I want magic! [*Mitch laughs*] Yes, yes, magic! I try to give that to people. I misrepresent things to them. I don't tell truth, I tell what *ought* to be truth. And if that is sinful, then let me be damned for it! —*Don't turn the light on*!") (emphasis in original).

claim. They cite no authority supporting an award of fees to a losing party under the bad faith exception.[61] The Blanch Defendants' application for an award of fees under the bad faith exception is denied.

\* \* \*

The evidence illuminates a myriad reasons and examples for why fee shifting here is warranted. The Blanch Defendants engaged in multifaceted-bad-faith conduct throughout this litigation, which is further demonstrated by their briefing on this motion.[62] This court has shifted the entirety of one party's attorneys' fees when the other party has engaged in a pervasive pattern of egregious conduct. *See, e.g.*, *Choupak v. Rivkin*, 2015 WL 1589610, at \*23 (Del. Ch. Apr. 6, 2015) ("The pervasive nature of Rivkin's conduct warrants shifting all of the attorneys' fees and expenses that Choupak, Sofinski, and Intermedia incurred."), *aff'd*, 129 A.3d 232 (Del. 2015); *ATR-Kim Eng. Fin. Corp. v. Araneta*, 2006 WL 3783520, at \*22 (Del. Ch. Dec. 21, 2006) ("Araneta engaged in a deliberate pattern of obfuscation ranging from the obstruction of legitimate discovery requests, to the presentation of baseless

---

[61] In fact, the Blanch Defendants argued in their post-trial briefing that "a *prevailing party* may obtain an award of attorneys' fees." Dkt. 366 at 40 (quoting *Nagy v. Bistricer*, 770 A.2d 43, 51 n.6 (Del. Ch. 2000)) (emphasis added).

[62] True to form, the Blanch Defendants filed their answering brief on this motion one day past the deadline without any explanation. *See* Dkt. 406.

and shifting defenses, and ultimately to the telling of outright lies under oath and the submission of a phony defense in an attempt to escape this court's jurisdiction"), *aff'd*, 930 A.2d 928 (Del. 2007); *Arbitrium*, 705 A.2d at 237 (holding that conduct which "permeated virtually [the] entire litigation" would "alone [] justify an award of all of the plaintiffs' attorneys' fees"). The Blanch Defendants' conduct rises to this level. Additionally, this court already held that one of the Blanch Defendants, Richard Blanch, breached the duty of loyalty, which further counsels that a broad recovery here is warranted. *Stone & Paper*, 2021 WL 3240373, at *25; *see William Penn*, 13 A.3d at 758. Therefore, Plaintiff is awarded all of its attorneys' fees incurred in this matter, which shall be paid by the Blanch Defendants.

## III. CONCLUSION

Stone & Paper's application for an award of its fees and expenses incurred in this litigation is GRANTED. Stone & Paper shall serve and file an affidavit in accordance with Court of Chancery Rule 88 within the next ten business days. Any opposition to the Rule 88 affidavit shall be served and filed within ten business days after the filing of the affidavit. Any reply shall be filed within five business days of the opposition.

The Blanch Defendants' application for an award of fees and expenses under the bad-faith exception is DENIED.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Paul A. Fioravanti, Jr.*

Vice Chancellor